# WHITNEY *v.* UNITED STATES.

## APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 271.   Argued April 9, 1897. — Decided May 24, 1897.

The claimants have not made out their case by a fair preponderance of evidence, or such weight of testimony as is necessary to establish their title to this large tract of land.

THIS was a petition by Joel Parker Whitney and others filed in the Court of Private Land Claims for the confirmation of what is commonly known and called the "Cañada de Cochiti grant," containing over 100,000 acres, and situated on the Rio Grande River, in the county of Bernalillo, Territory of New Mexico.   On the day following, Manuel Hurtado and José Antonio Gallegos filed a suit against the United States for the confirmation of the same land, claiming under the same title.   It appearing to the court that these two suits were for the same property and under the same original title, the court ordered them to be consolidated, and to proceed as one cause.

The petition set forth that, on the 2d of August, 1728, the King of Spain, by Juan Domingo de Bustamente, governor of the Royal Province of New Mexico, upon the petition of one Antonio Lucero, made a grant of a certain tract of land, bounded and described as follows: On the north by the old pueblo of Cochiti; on the east by the Rio del Norte (otherwise called the Rio Grande); on the south by the lands of the Cochiti Indians, and on the west by the Jemez Mountain, with its entrances and exits, watering places, uses and customs. That the granting decree for said land was signed by the governor on said date, and countersigned by Antonio de Cruciaga, his secretary of state and war, and it directed that the grantee should be placed in royal and personal possession under the boundaries described in said petition, and under the conditions prescribed by the royal ordinances in that behalf as to the settlement of the same.   It also directed that, after the possession of the land had been given to the grantee, the original

*expediente* should be returned to the governor, to the end that duplicates thereof might be given to the grantee; that in execution of said decree, Captain Andres Montoya, chief alcalde of the pueblos of Cochiti, Santo Domingo and San Felipe, gave to the said Lucero juridical possession of the land on August 6, 1728, executing and delivering the act of juridical possession on the premises in due form of law in the presence of his attending witnesses.

The petition also alleged that the granting decree and act of juridical possession were returned to the governor and placed in the royal archives of Santa Fé, New Mexico, and that a *testimonio*, or duplicate thereof, was delivered to the grantee; and that the said *testimonio* was not in the possession, custody or control of the petitioners, but that the same was deposited in the governmental archives at Santa Fé upon the cession of New Mexico to the United States, and has ever since been in its custody.

It was also alleged that Antonio Lucero settled upon, occupied, improved, enlarged and claimed the land in fee simple openly, continuously and uninterruptedly from the date of the act of possession, August 6, 1728, for a period much longer than four years, and up to the time of his death, and that he died fully seized and possessed of the same; that his heirs-at-law and legal representatives have ever since continued under the same claim of title, peaceably occupying and possessing the same, save only in the year 1785, when it was intruded upon by one Antonio Gallego, a lieutenant in the military service at the place called Cañada del Medio, under pretence of authority from Governor de Anza to occupy and use the cañada for the pasturage of the royal cavalry; whereupon, in the month of November, 1785, Antonio Lucero de Godoi and numerous others, descendants and heirs-at-law of said original grantee, presented their petition to Antonio de Armenta, chief alcalde and war captain, having, as alleged, judicial and administrative jurisdiction in the premises, complaining of the said intrusion by the lieutenant, Gallego, and asking for relief in the premises. It was alleged that, in view of said petition, Arm uta, the said chief alcalde, reported said petition and the

subject-matter thereof to the governor; and, upon due consideration of the petition, the governor found and determined, and so declared in substance to the chief alcalde and war captain, that, inasmuch as the petitioners were in all respects the legal heirs of the said tract of land, they were entitled to occupy the same in preference to any other individuals, and the said intrusion by the said Lieutenant Gallego was unjust and unfounded.

That thereupon the chief alcalde and war captain, under full authority in that behalf conferred upon him by the said governor, duly made his order and judgment, reciting the petition, report to the governor, and the determination of the superior authority thereon, adjudging and declaring that the said order and judgment, being an instrument in writing signed by the said chief alcalde and his witnesses, should remain as conclusive evidence of the rightful title of the said heirs to the said land granted and its rightful acquisition by them and their descendants from the King of Spain; and by the said instrument the said alcalde, in the exercise of the judicial jurisdiction legally vested in him, declared that the same should remain before any tribunal as evidence for all time of the title of the heirs to the tract of land granted.

That the originals of said petition and adjudicatory instrument were in the possession of the respondent and kept in the archives at Santa Fé;

That the petitioners are interested in said tract under the original grantee by divers mesne conveyances from his heirs and legal representatives; and

That all conditions, precedent and subsequent, of the grant at any time incumbent upon the said grantee, his heirs or assigns, have been fully performed and discharged.

The answer of the United States put in issue the allegations of the petition generally, and specifically denied that the alleged granting decree and act of possession were returned to the governor and placed in the royal archives at the city of Santa Fé, New Mexico; denied that a *testimonio* or duplicate thereof was delivered to the said original grantee under and by virtue of the direction of the governor; denied that

the alleged *testimonio* or duplicate was ever placed in the governmental archives at Santa Fé upon the cession of New Mexico to the United States, for the reason that there was no necessity for nor any law authorizing the same, but that the owners or alleged owners of the grant were the only proper custodians of said alleged *testimonio*. It denied specifically that Lucero ever entered upon the tract of land sued for, and occupied or appropriated the same, as alleged in said petition, for the reason that it was impossible and impracticable for him so to do, because, under the conditions of the country at the time and for more than a century thereafter, it was impossible for Lucero or any one else to occupy, appropriate, or use, directly or indirectly, the grant described in the petition ; all of which Lucero knew at the time he applied for said grant.

As to the allegation that, in 1785, Antonio Gallego intruded upon the Cañada del Medio, an alleged portion of said tract, upon the pretence that he had authority from the governor to use the same for the pasturage of the royal stock, the Government alleged that it had no knowledge or information ; nor as to whether in said year Antonio Lucero de Godoi and others, claiming as descendants of Lucero, presented a petition to Armenta, chief alcalde, complaining of said intrusion, and asking for an investigation of the same or for relief. Nor had it any knowledge or information as to whether Antonio. Armenta, alcalde, reported said petition or the subject-matter thereof to the governor of New Mexico ; nor as to whether, in passing on said matters, the said alcalde had any authority to act in that behalf under the authority of said governor ; nor as to whether said alcalde undertook to make a finding in said matter ; nor as to whether he undertook to or did attempt to make the allegation set forth in the petition ; but it was alleged that if he did do so, the same was without warrant or authority of law, and without any direct order from the governor, and that the said alcalde had no power or authority in that behalf except such as might be conferred upon him for that purpose by direct order of the governor of the province, and the Government therefore denied that said

alcalde had jurisdiction in the premises, and denied that any jurisdiction was shown in that behalf.

It denied that the originals of said petition and adjudicatory instrument, dated in the year 1785, before referred to, were or ever had been in the said archives; and alleged that if the same were in the possession of the surveyor general they were filed with him under the law of July 22, 1854, which provided for the adjustment of private land claims in the Territory of New Mexico, and that they never constituted part of the archives of the Spanish or Mexican Governments; that no action was ever taken upon said alleged acts of said justice by the governor of the province; and, therefore, it constituted neither adjudication nor admission on the part of the Spanish Government, but was simply an unauthorized and unapproved act of an alcalde.

Further answering, the Government alleged that the petition by Antonio Lucero was one for a small piece of land on which to cultivate ten fanegas of wheat and two of corn, and to pasture small stock and horses; that the boundaries designated in said petition were only to indicate the district of country within which said small piece of land was located; that in acting upon said petition, if he ever did, the said governor did not make a grant, but specially reserved that act until after the alcalde should have placed the petitioner in possession of the property and returned the *expediente* to him for final action, which was never done, and, therefore, no grant, either legal or equitable, was ever made.

Upon a hearing upon pleadings and proofs the Court of Private Land Claims was of opinion that the petitioners were not entitled to the grant to the full extent demanded of 104,554.24 acres, but that they were entitled to a grant of land "bounded on the north by the old pueblo of Cochiti, which is situated on the mesa of Cochiti on the south side of the cañada of Cochiti, which point is about eight thousand one hundred and ninety feet in a northerly direction from the northwest corner of the lands of the Indians of the pueblo of Cochiti, as the same has been fixed and determined by the survey and patent of the same by the United States of Amer-

ica; on the east by the Rio del Norte (otherwise called the Rio Grande); on the south by the lands of the Cochiti Indians, as the same has been fixed and located by the survey and patent thereof to the Indians of the pueblo of Cochiti by and under the authority of the United States of America, and on the west by the same old pueblo first above referred to as the northern boundary of the grant hereby confirmed, which said grant of lands contains in area about five thousand acres of land"; and that such claim was entitled to confirmation in the name of the original grantee, Antonio Lucero, for the use and benefit of all parties in interest, claiming by, through or under him, by the same title. Whereupon petitioners prayed and were allowed an appeal to this court.

*Mr. John H. Knaebel* for appellants.

*Mr. Matthew G. Reynolds* for appellees. *Mr. Solicitor General* was on his brief.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

Some difficulty in this case arises from the mutilated and fragmentary condition of the original petition in Spanish, and the grant of the land prayed for, purporting to be of the same. date, and supposed to have been made by Bustamente, Governor and Captain General of New Mexico. The original petition as it now appears, reads as follows, .the stars indicating the illegible portions :

"Antto. Lusero  *  *  querque ante  *  *  resco por aqu  *  *  que el derech  *  *  por quanto  *  *  familia y no  *  *  ante V. SSa.  *  *  so de tierra  *  *  en la Mesa de Cochiti donde estubieron retirados los indios que se sublebaron para en el sembrar i cabra [labrar] en dicho pedaso de tierra, dies anegas de trigo y dos de mais, y para apastar mi ganado menor y Cavallada, y luida dicha tierra por la parte del norte con el Pueblo Viejo de Cochiti, y por el oriente con el Rio del Norte,

y por el Sur con tierras de las naturales dicho pue * * el poniente con * * de Xemes con sus * * salidas abreva * * y Servidumbres * * lo en perjuisio de * * de serbir V. SSa. de * * ersed en nombre * * gestad por todo * * lico provea y mau * * do que resivire * * rsed y juro por Dios Nuestro Señor no ser de malicia en lo necesario &a.

"ANNTO. LUCERO."

The description of the land prayed for, which is the only part of the petition material to this case, may be represented in translation as follows :

" * * cel of land * * on (or at) the mesa of Cochiti where the Indians who rebelled retreated, to sow thereon, and to cultivate on said piece of land about ten fanegas of wheat and two of corn, and to pasture my sheep and horse herd ; and the said land is bounded on the north by the old pueblo of Cochiti, and on the east by the Del Norte River, and on the south by the lands of the natives of said pue * * the west with * * of Jemez."

The grant, which appears immediately at the foot of the petition, is also partly mutilated, but so far as it is legible and can be translated reads as follows :

"VILLAGE OF SANTA FÉ, August 2, 1728.

" This petition was presented by the party therein before his excellency the governor and captain general of this kingdom of New Mexico.

" And the same being examined by his excellency he treated the same as presented and regis * * the land which the party asks, and for which purpose he ordered * * ed that the chief alcalde of San Felipe Santo Dom * * and Cochiti to proceed and examine said piece of land by * * tation of the natives of said pueblos and others who may live near, and there being any opposition to suspend, and there being no impediment and it being without prejudice to a third party having a better right the grant is made to him in the name of His Majesty, and he will be placed in royal and personal posses-

sion under the boundaries he refers to and of which having acquired it  *   *   *"

This grant was probably signed by Bustamente, and countersigned by Antonio de Cruciaga, his secretary of state and war, although these signatures do not now appear upon the original documents.

These documents are produced by the petitioners themselves, and not, as usual, by a *testimónio* or copy certified by the proper officer.

As this grant refers to the land demanded in the petition for a description, it throws no light upon the controversy in this case, which turns, not upon the validity of the grant, which is admitted, but upon the identification of the calls or objects described as boundaries, and therefore of the extent of the grant. As the grant is bounded upon the east by the Rio del Norte or Rio Grande, of course there can be no uncertainty so far as to what is meant. As the boundary upon the south is "by the lands of the natives of said Pue  *   *" meaning, evidently, thereby the Pueblo of Cochiti, and as this boundary appears to have been fixed and located by the survey and patent to the Indians of this pueblo, by and under the authority of the United States, no question is made with regard to its correctness. The difficulties arise from the uncertainty as to what is meant by the "Old Pueblo of Cochiti," described as the northern boundary, and by the western boundary, described as "the west with  *   * of Xemes (Jemes)."

The chief contention is over the northern boundary, owing to the fact that there are two Pueblos of Cochiti, one of which is seven miles to the northeast of the other. The court below adopted the southernmost one, known as the Pueblo Viejo de Cochiti, as answering the call in the grant of the Old Pueblo of Cochiti, while the petitioners insist upon locating the north boundary by what was, and still is, known as the Pueblo Viejo, which is supposed to have long antedated the other.

There are other calls, however, which tend to identify the description with greater certainty:

1. The land is described as "*en la mesa de Cochiti donde estubieron retirados los indios que se sublebaron,*" in or upon (or perhaps *at,* the difference being immaterial) the *mesa* (tableland) of Cochiti, where the Indians who rebelled retreated.

The location of this *mesa* is perfectly well settled. It lies upon the southerly side of the *cañon* or *cañada* (water course) of Cochiti, its northerly side forming the wall of the cañon. It is evident, however, that the grant was not intended to be limited to the *mesa* itself (notwithstanding the use of the word " en "), which appears to have been comparatively small, as the grant extended easterly across the Cochiti *cañon,* the Cañada José Sanchez, and the lower waters of the Cañada de en Medio, some five miles to the Rio Grande, and included about 5000 acres of land, a considerable part of which seems to have been arable.

Upon this *mesa* is a ruined pueblo commonly known as the Pueblo de Cochiti. Whether it was also known as the " Old Pueblo of Cochiti " is one of the points in dispute here. It seems that the Spanish, who settled this territory as far to the north as Santa Fé, during the middle and latter half of the sixteenth century, were, about 1680, driven out by the Indians, whom they had reduced to a virtual condition of slavery ; and that, for about thirteen years, the latter continued to control the country, defeating successive Spanish expeditions, until, in 1693, they were reconquered by Diego de Vargas ; and the Cochiti Indians, or a portion of them, took refuge in the pueblo upon the *mesa* of Cochiti. We do not understand this fact to be questioned ; and it goes a long way toward identifying this pueblo as the " Old Pueblo of Cochiti," mentioned in the same description as the northern boundary of the grant. It does not seem very probable that, after having mentioned the *mesa* of Cochiti, upon which it is admitted there was a pueblo, and then proceeding to bound the land on the north by the " Old Pueblo of Cochiti," Lucero intended a wholly different pueblo, situated seven miles to the northeast of the other.

The very fact that such prominence was given to the *mesa*

of Cochiti indicates that it was mentioned for some purpose, the subsequent description of the grant by boundaries being complete in itself. Upon the theory of the claimants it is difficult to see why this *mesa* was mentioned at all. Upon that theory it was not named as a boundary, since both the north and west boundaries are claimed to be miles from this pueblo, and as a local object it seemed to have been no more prominent or worthy of mention than several other pueblos within the alleged limits of the grant. Assuming that Lucero stood there, and from that spot made a mental image of what the extent of his claim should be, does not aid the matter, since it is quite as likely that he intended to claim the comparatively fertile land between himself and the Rio Grande, as the vast territory now claimed by his heirs and assigns. In view of the fact that there was a pueblo upon this *mesa* — a pueblo still known as the pueblo of Cochiti — the natural inference is that he desired to connect this *mesa* with the "Old Pueblo of Cochiti," named as one of the boundaries.

2. That Lucero did not intend to claim an extensive grant is also evident from his express purpose, "*para en el sembrar i cabra (labrar) en dicho pedaso de tierra dies anegas (fanegas) de trigo y dos de mais, y para apastar mi ganado menor y Cavallada*," "to sow thereon, and to cultivate on said piece of land ten *fanegas* of wheat and two of corn, and to pasture my stock of small cattle and horses." The words "*ganado menor*" are used to indicate, not a small herd of cattle, but a herd of small cattle (sheep), as distinguished from a "*ganado mayor*," or herd of large cattle. The word "*fanega*" is used both as a dry measure and as a measure of land, and in its former sense it appears to have been somewhat uncertain in quantity, varying from one and one half to two and one half bushels; or, to speak more accurately, about one hundred-weight of grain. As a measure of land it appears to have been even more uncertain, indicating, not the quantity of land necessary to raise a *fanega* of wheat, but that quantity which requires a *fanega* of wheat to sow it. The *fanega* of wheat differs again from the *fanega* of corn. It is agreed, however, in this case that the twelve *fanegas* called for would

be about thirty-three acres. Under any method of determining what a *fanega* was intended to represent, it would seem that 5000 acres of land, if any of it were cultivable, would be amply sufficient, while the 104,000 acres claimed would be out of all proportion to the calls of the grant. How much land would be necessary to pasture his stock of sheep and horses would depend so much upon the character of the land and of the size of his herd that it throws no light whatever upon the intended limits of the grant.

3. All these conjectures, however, are preliminary to and useful as throwing light upon the more important question as to what is meant by the "Pueblo Viejo de Cochiti," mentioned in the petition as the northern boundary. Lucero apparently had been a soldier in the Spanish army; had taken part in putting down the rebellion of the Indians, and had a somewhat numerous family. Claimants' argument in this connection is that, by these words "Pueblo Viejo de Cochiti," must be understood a pueblo about seven miles to the northeast of the *mesa* of Cochiti, and commonly known as the Pueblo Viejo, on the Potrero de las Vacas — the farm or *mesa* of the cows. It appears that when the Cochiti Indians, after being defeated by the Spaniards, retreated to the historical *mesa* of Cochiti, in the latter part of the seventeenth century, they built there the pueblo which has now, after the lapse of upwards of two centuries, become known as the Old Pueblo of Cochiti, although at the time of the grant it was not in reality an old pueblo, having been burned by the Spaniards not much more than thirty years prior thereto. It is possible, however, that Lucero did not refer to this particular pueblo as the Old Pueblo of Cochiti, since it appears from Professor Bandelier's work upon Archæological Investigations in the Southwest, part 2, page 178, that the oldest ruins on the *mesa* of Cochiti are those of a prehistoric Quéres pueblo, although the best preserved are those of the pueblo built after the year 1683, when the Indians retreated there, and abandoned, April, 1694. In virtue of these older ruins the pueblo may well have acquired the name of the Old Pueblo of Cochiti without reference to the later ruin. We do not regard this as of any

decisive weight, however, as it does not take long for a deserted village or house to become known as "the old house," etc. It also appears that the Pueblo Viejo is of much greater antiquity than that of Cochiti, and at the time of the grant was a conspicuous object in Cochiti traditions, and so much venerated by the Indians in that vicinity as to be resorted to for religious or semi-religious purposes. This fact is the basis of the main argument for the claimant.

We have, however, carefully considered the testimony upon this point, and have come to the conclusion that while Pueblo Viejo may have been much the older of the two, it was never commonly known as the Pueblo Viejo de Cochiti, and that while the southerly of the two pueblos was generally known as the Pueblo de Cochiti, it was also known as the Pueblo Viejo de Cochiti.

4. The uncertainty regarding the western boundary arises from the blank in the description "*et poniente con*  *  *  *  *de Xemes*" — "the west with  *  *  * of Jemez." That a word is torn off is perfectly obvious from an inspection of the original document. That this word related to something connected with Jemez is equally evident. The claimants insist that these words must be explained by the context, the topography of the country, the customary adoption in royal grants of prominent natural objects, or conspicuous artificial objects, as landmarks, the significance of names used as descriptive of well-known places, and by the reasonable probabilities of the case. As the boundaries of this grant, like those of Spanish land grants generally, were fixed by such landmarks — upon the east by a river; upon the north by a pueblo; upon the south by the lands of another pueblo — it is natural to suppose that the western boundary was fixed, either by reference to a river, a cañada, a pueblo, or a range of mountains (sierra), also a most common boundary. As the Jemez River is far to the westward of the *sierra* of that name, it is very improbable that this was intended. There was also an ancient Indian village or pueblo of that name, whose inhabitants did not belong to the Queres stock from which the Cochiti Indians sprang, and were in no respect affiliated with them. The

languages of the two communities were different; they could not even converse together, except in Spanish; the two villages of the two nations were quite distinct; each inhabited, cultivated, pastured and hunted over a district into which the other tribe did not intrude unless by favor, and the Jemez country, with its fields and mesas, streams and mountains, lay far to the west of the Cochiti country. The village occupied by the Indians of the Jemez was called the Pueblo de Jemez. The river that flowed about its land was called the Rio de Jemez, and its cañon the Cañon of Jemez, while the mountains adjacent were called the Sierra de Jemez. As this sierra was the first natural object to which the name of Jemez was affixed, lying to the westward of the mesa of Cochiti, we think the grant must have referred to that *sierra;* or if there were more than one range of mountains known as the Sierra de Jemez, then to the one most easterly. Perhaps this will not extend the grant beyond the mountains immediately west of the *mesa.*

There was also some evidence tending to show that the west boundary was reputed to be the *sierra,* and some to the effect that the stock of Lucero and his descendants grazed as far west as the Jemez Mountains. It must be confessed that this evidence is not entitled to great weight, but, such as it is, it supports the inference that one would naturally derive from an inspection of this mutilated grant.

So, also, in the admitted reproduction or restoration of these documents, made by the alcalde de Baca in 1817, to which reference will hereafter be made more in detail, the words "la Sierra" are imported before "de Jemez." If this restoration of the mutilated documents be of no other value, it tends, at least, to show the opinion of an intelligent native of that region, familiar with the topography of the country and the customary boundaries of Spanish and Mexican grants, as to what this grant probably intended to refer to as the westward boundary. If Lucero had intended to fix the western limit at the pueblo or *mesa* of Cochiti, it is probable that he would have used the word "Cochiti," instead of the word "Jemez" which, as above stated, indicated clearly that

some natural object, to which the word "Jemez" was fixed, must have been within his contemplation. The very fact that he made the pueblo the northern boundary, without also making it the western boundary, indicates that another boundary to the westward was intended. We are, therefore, of opinion that the court below erred in locating the western boundary by the pueblo of Cochiti, and that it should be extended westward to the nearest sierra or other natural object that bears the name of Jemez.

Certain proceedings, subsequent to the grant, are also called to our attention as tending to throw light upon the identification of the old pueblo de Cochiti.

5. The first of these, in the order of time, is an appeal made by the alcalde mayor, Don Bartolomé Fernandez, "in favor of the republic of the Indians of the pueblo of Cochiti against some residents called Romero, who claimed to settle the place called . El Capulin," which was probably in the Cañon Capulin, in the northeasterly portion of the tract claimed in this proceeding.

In this appeal, Fernandez brought to the notice of the governor that at the place commonly called El Capulin, contiguous to the pueblo of Cochiti, the Romeros were settled, and, in view of the fact that during all the time he had lived in this country, he had never seen said tract settled, which was the pasture land of the horses and stock of the said pueblo, and other residents of the kingdom, and not knowing of any grant having been made to authorize such settlement, he informed the governor and captain general of the fact.

In answer to this, an order, in the nature of an order *nisi,* seems to have been made, directing the alcalde to eject the settlers, unless they showed cause to the contrary. The document is a very peculiar one, but this seems to have been its purport.

Romero thereupon appeared before the governor by petition, stating that he had been notified by Fernandez to vacate the Capulin, and that he had obeyed immediately; but that he had not removed his property, as he had held it for five years and six months without objection until this year (1765), when

it was made known that he had purchased parts which did not belong to him by law, from parties claiming under a grant to one Andres Montoya, which instrument he presented with due formality, stating that he saw no reason for his being interfered with or deprived of his purchase. Thereupon the governor and captain general of the kingdom, under date of April 18, 1765, ordered that the previous order be carried into. effect, and that the parties be again notified not to settle by building or cultivation at the said place of Capulin, "they being permitted only to have their stock on the said place of the Capulin as crown land, as the other residents do, but without prejudice to the pueblos and republics of the Indians of Cochiti and San Ildefonso," which the alcalde mayor of the city of Santa Fé was directed to notify to them, and which he accordingly did, and made return thereof.

Attached to these papers is the grant to Andres Montoya, which covers a tract between the orchards or gardens of Cochiti on the south, and on the north by the orchards of San Ildefonso. This grant, which was made in 1739, seems to have been subsequently cancelled as fraudulent, because there did not appear to be any citation of the adjoining land holders.

The litigation seems to have been terminated by an order of April 25, 1767, made by Don Fermin de Mendinueta, governor and captain general, reciting the nullity of the grant to Montoya, and that the attempted settlement by Romero was in 1765, twenty-six years after the grant was made (1739); declaring the grant to Montoya to be of no value; that the only rights which Romero had were those enjoyed and used by the natives of Cochiti and the adjoining residents, as *crown lands*, and ordering that neither Romero nor anybody else should settle or have ownership in the said tract of the Capulin, and "that it shall be held and esteemed as crown land for the common benefit of all those who may desire to pasture their stock on the same, without excluding the said Romero."

Of course, these proceedings cannot be considered in the light of *res adjudicata*, since neither the Spanish crown, the predecessor in title of the United States, nor Lucero were

parties thereto.   The only weight that can be given to them is that of a general reputation that the lands upon the Cañada de Capulin were considered and treated as crown lands, over which the Cochiti Indians and other residents of the neighborhood had some indefinite rights of pasturage.   As these lands were within the asserted grant to Lucero, it is somewhat singular that he made no resistance to the claim of Romero; put forward no title in himself; and left the litigation to be carried on by the natives and other residents of that neighborhood, who were allowed to pasture upon these lands as crown lands.

6. Similar considerations apply to the adjudication of 1785, which arose from an alleged intrusion by one Antonio Gallego upon lands in the Cañada de en Medio.   The proceedings opened by a petition by the heirs of Lucero to the chief alcalde and war captain, Antonio de Armenta, claiming to be residents of the jurisdiction of the Cañada de Cochiti, and heirs of the place, and complaining that their lieutenant was seeking to possess for himself for the purpose of pasturing "the few cavalry we have for the royal service of His Majesty, whom may God preserve, and for better protection concerning which we declare, sir, that that favor of our lieutenant is very grievous," the petition terminating with a prayer that the matter be examined into, and their rights protected.

Upon this petition, the alcalde made an order reciting the injury done to the heirs of Lucero in desiring that the Cañada de en Medio remain reserved for cavalry upon the petition of Gallego, and finding that the petitioners were, in all respects, the legal heirs to the tract.

The proceedings in this litigation undoubtedly form a strong item of testimony in favor of the claimants' theory of this case, and we are by no means disposed to deny their weight.   At the same time they are by no means conclusive. The crown was not a party to nor represented in the litigation. There was no attempt to adjudicate that the northern boundary was the Pueblo Viejo, or that the Luceros had a good title to the cañada against any one but Gallego, who seems to have been little better than a trespasser, and put forward no title to

the land himself. Indeed, it would appear from the order of the alcalde that such right as he had was " by favor only " to " raise a few sheep * * * without having any title or document which might accredit its being his."

7. The next item of testimony upon which the claimant relies is that of the so-called *testimonio por concuerda*, which purports to have been made in 1817 by Juan Antonio Cabesa de Baca, chief alcalde of the jurisdiction of Cochiti, and is certified to be " a true, faithful and legal copy of the documents of grant to which they refer, of which, as they are incomplete and very badly treated [*truncos y muy mal tratados*], this copy has been made with great labor before the witnesses of my attendance, who saw it made, corrected and amended from the original instruments." The first paper is a restored petition of Lucero, at the foot of which is a grant by the governor and captain general, Bustamente, countersigned by his secretary of state and war. Following this is the certificate of Andres Montoya, chief alcalde, to the effect that on August 6, 1728, he gave to Lucero possession of the lands " expressed and mentioned in this grant," and, having registered the same, took Lucero by the hand and "conducted him over said land in sign of lawful possession, and there being no person whatever, who, under a better right might claim the same, I deemed it good."

The court below was of opinion that this proceeding was wholly void; that it was in the nature of a case against the crown; that the effect of it would be to create evidence to deprive the crown of title to its land, and that alcaldes had no jurisdiction of that kind. We do not find it necessary, however, to determine this question, since, so far as we can judge, this *testimonio*, or official copy, does not differ in any essential particular from the original, except so far as making more definite the westerly boundary of the grant at Sierra de Jemez. That a grant was actually made to Lucero is not disputed. So far as the erasures and mutilations of the original are supplied in the restored grant, they are immaterial, except as connected with the description, which is an exact reproduction of the description in the original grant, except as to the

western boundary, which is declared to be the Sierra de Jemez; and, as we have already found that this is what was intended by the parties, this alleged copy is only a confirmation of the opinion we have already reached from an inspection of the original grant, and from the probabilities of the case. We do not regard this copy as affecting at all the conclusions to be reached from the other evidence in the case.

8. The claimant also relies upon a long-continued adverse possession of this land, maintained for nearly 170 years from the date of the grant, and nearly eighty years from the date of the *testimonio* issued by the alcalde mayor de Baca. Had it been shown that this possession was complete, adverse and undisputed during the whole life of this grant, such possession would probably be regarded as complete evidence of title. Nor are we disposed to deny that the fact that the Luceros, and their descendants pastured stock upon these lands is evidence of such possession, but in order to make it of any particular weight it should be shown to have been exclusive, and that no other person pastured or had the same right to pasture upon these lands. The proceedings in the case, first above mentioned, of the intrusion by the Romeros indicate the lands to have been held in common and to have been subject to pasturage by the Indians, and other residents of that neighborhood. Under such circumstances, it should be made to appear that the rights of Lucero and his descendants were exclusive in this particular. In addition to this, however, it is a fact, so notorious that we may take judicial notice of it, that mere pasturage upon these western lands is very slight evidence of possession. The court below was of opinion that "from a practical standpoint the grazing of stock in this country has no value as evidence of practical location." In view of the fact that all, or nearly all, of this testimony respecting possession is given by witnesses who are descended from Lucero, or connected with his family, or are interested in the litigation, and the possession relied upon is not shown to have been exclusive, or inconsistent with the use of this vast tract as a pasturage common to all the dwellers in that neighborhood, we think the court did not err in refusing to give it weight as evidence of title.

Other ancient documents offered by the claimants may be laid out of consideration. They consist principally of conveyances, to some of which members of the Lucero family were parties, but the descriptions of the lands are too uncertain to afford any definite information upon the extent of the grant, or even of what was claimed by Lucero in that connection.

Upon the whole, we have come to the conclusion that the claimants have not made out their case by a fair preponderance of evidence, or such weight of testimony as is necessary to establish their title to this large tract of land. We should have reached this conclusion without hesitation had it not been for the proceedings connected with the ouster of Antonio Gallego from the Cañada de en Medio in 1785, which is really the only item of testimony at all inconsistent with the Government's theory of the case; but, after all, this is but evidence of a general reputation, or of a judicial ruling in a case to which the crown was not a party; and it is not at all improbable that the alcalde may have considered Lucero's title to be good as against one who had no title at all beyond a mere permit to pasture a few horses, or raise a few sheep thereon, " without having any title or document which might accredit its being his." It does not follow that, if the Government itself had attacked the grant or the extent of it, his ruling upon that point would not have been different; in fact, the ruling in the prior case between the Indians of the pueblo and the Romeros is about as strong evidence that the lands at El Capulin, also within the assumed limits of the grant, were crown lands, as the judgment in this case was that the lands upon the Cañada de en Medio belonged to the Luceros.

These judgments are really of little value except as throwing light upon the occupation or attempted occupation by Lucero of that portion of the tract lying nearest to the Rio Grande, and of the general reputation as to the extent of his grant. The chief reliance must be upon the terms of the petition itself, and it is fortunate that the most important part of this petition, namely, the description of the boundaries, has been best preserved. The only real difficulty in its interpretation is the ambiguity arising from the words " Pueblo

Viejo de Cochiti." The burden of proving the larger grant is upon the claimants. So long as the description is reconcilable with the smaller grant, and with a pueblo located upon the mesa of Cochiti, the Government is entitled to the benefit of that construction. The location of that pueblo seven miles to the northeast is supported by testimony too shadowy to be a safe basis for a legal adjudication in favor of the claimants.

While we agree with the court below upon the main question involved, the different view we have taken regarding the western boundary requires that its decree be

*Reversed, and the case remanded for further proceedings in conformity with this opinion.*