**UNITED STATES et al., Appellants,**

v.

**CHESAPEAKE & POTOMAC TELEPHONE COMPANY et al., Appellees.**

Nos. 13570, 14206 and 79–499.

District of Columbia Court of Appeals.

Argued Oct. 23, 1979.

Decided July 14, 1980.

Carl Strass, Washington, D. C., a member of the bar of New York, pro hac vice, with whom James W. Moorman, Asst. Atty. Gen., Dept. of Justice, Dirk D. Snell and William E. Hill, Washington, D. C., were on the brief, for appellants. John J. Zimmerman, Washington, D. C., also entered an appearance for appellant, United States.

Whayne S. Quin, Washington, D. C., with whom James A. Stenger, Washington, D. C., was on the brief, for appellees.

Before NEWMAN, Chief Judge, and KERN and HARRIS, Associate Judges.

KERN, Associate Judge:

Appellees own various parcels of realty in downtown Washington abutting certain alleys.[1] They filed applications with the District of Columbia Council (Council) to close these alleys on the ground they were "useless or unnecessary." D.C. Code 1973, § 7–401.[2] Appellees' applications for alley–closing were routinely processed through the appropriate District of Columbia agencies and departments and ultimately approved by the Council, subject to a proviso which is the bone of contention in this litigation. The Council conditioned closing the alleys in question upon payment by appellees of the fair market value of the area of land contained in each alley, taking such action because it believed title to the alleys was in the United States.

Appellees filed complaints against the Council and the District of Columbia in the trial court seeking (1) a declaratory judgment that the Council had no right to condition the alley–closings upon payment of such charge, and (2) a mandatory injunction directing the return of the moneys charged which each appellee, pursuant to an agreement executed with the Corporation Counsel, had deposited in escrow pending judicial determination.

The trial court, after taking testimony and hearing argument on cross–motions for summary judgment, entered judgment for appellees.[3] It concluded, in a comprehensive opinion, 106 Wash.Law. Rep. No. 104, pp. 1065, 1068–75, June 13, 1978, that title to the alleys was not and never had been in the United States, but rather in the predecessors in title to the appellees. Therefore, title to the land in the alleys reverted to appellees under the terms of the statute. *See* note 2, *supra*. The Council could not charge for the alley closings and appellees

---

[1.] The area in which these alleys are located is the so–called original city, developed originally for the Federal City, and so the alleys may properly be called original alleys.

[2.] The applicable statute, Section 7–401, provides that after an alley is closed "title to the land embraced within the public space so closed" shall "revert to the owners of the abutting property," *unless* "the title to such land be in the United States." In such case, the statute

authorizes the land to be sold "for cash at a price not less than the assessed value of contiguous lots." D.C. Code 1973, § 7–302. A comprehensive explanation of the so–called Street Readjustment Act, D.C. Code 1975 Supp., § 7–401 *et seq.*, is contained in *Carr v. District of Columbia*, 171 U.S.App.D.C. 432, 434–35, 543 F.2d 917, 919–20 (1976).

[3.] The opinion decided the merits of six consolidated cases.

were entitled to the return of their money being held in escrow.

The trial court, in rendering its ruling, also concluded the United States was not an indispensable party within the scope of Super.Ct.Civ.R. 19(b). Hence, appellees' complaints were not subject to dismissal for their failure to have named the United States as a party defendant. The trial court rested this conclusion on the grounds that (1) the complaints challenged the authority of the Council to impose a payment as a condition precedent to the alley closings and sought return of money being held in escrow, rather than recovery of money from the United States Treasury;[4] and (2) "the United States is fully aware of this litigation and has actively participated in every phase of this litigation and could have intervened as a party if it had desired to do so."[5]

The Council and the District of Columbia noted a timely appeal from the summary judgment in favor of appellees, but then declined to proceed with their appeal. Whereupon the United States, pursuant to Super.Ct.Civ.R. 24, moved to intervene as a defendant in the case although judgment had already been entered. The trial court denied this motion. The United States noted an appeal from the trial court's ruling on its post–trial intervention motion, and also filed a timely appeal on the merits.[6]

Thus, we are confronted with two issues: whether the trial court, after trial and judgment, properly refused intervention by the United States as a party to the action, and whether the United States may proceed in this court with an appeal on the merits challenging the trial court's decision in favor of appellees.

■ The court's denial of the post–trial motion to intervene as a party was correct, given the adequacy of representation of the United States' interests at trial by the District, aided by federal attorneys. *See Calvin–Humphrey v. District of Columbia*, D.C. App., 340 A.2d 795 (1975).

The posture of the United States under the particular circumstances here, *viz.*, the District and the Council having abandoned their appeal, persuades this court to allow the United States to proceed on the merits. Therefore, we grant its motion for leave to intervene, filed with this court after oral argument, for the purpose of appealing the judgment on the merits. After consideration of the arguments by the United States we uphold the trial court's judgment in favor of appellees.

■ We note, in permitting the United States to proceed with its appeal on the merits, that one who was not a party to the action in the trial court has been allowed to intervene, post–judgment, for the purpose of taking an appeal under certain circumstances: where the proposed intervenor has an "appealable interest," acts promptly after the final judgment, and by its entry into the case on appeal will cause minimal prejudice to the parties already in the case. *See, e.g., United Airlines v. McDonald*, 432 U.S. 385, 395 n.16, 97 S.Ct. 2464, 2470 n.16, 53 L.Ed.2d 423 (1976); *United States Casualty Co. v. Taylor*, 64 F.2d 521 (4th Cir. 1933). Such intervention has been granted, even when the proposed appellant has had its interests adequately represented in the trial court through its own efforts.

■ In determining whether the proposed intervenor has an appealable interest, courts have utilized traditional standing principles; the would–be intervenor must be a person "aggrieved" by the decision it seeks to challenge. *United States v. Imperial Irrigation District*, 559 F.2d 509, 521

4. D.C. Code 1973, § 7–325 provides that all money received from "the sale of land in which the United States is interested . . . shall be paid into the treasury of the United States by . . . the District of Columbia to the credit of the United States."

5. The court noted the presence of a federal attorney at all times during the trial and his argument of the law on the appropriate occasions.

6. The appeals by the United States and the District of Columbia were consolidated.

(9th Cir. 1977).[7] Since the District of Columbia has declined to pursue its appeal of the judgment concluding these alleys were not owned by the United States, and since the United States is entitled by statute to the proceeds from the District's closing of any alleys owned by the United States, *see* note 4, *supra*, we conclude the United States is "aggrieved" by the decision.[8] *See Smuck v. Hobson*, 132 U.S.App.D.C. 372, 377, 408 F.2d 175, 182 (1969); *Wolpe v. Poretsky*, 79 U.S.App.D.C. 141, 144, 144 F.2d 505, 508, *cert. denied*, 323 U.S. 777, 65 S.Ct. 190, 89 L.Ed. 621 (1944). We note that its appeal on the merits was filed promptly after final judgment and its participation in this case on appeal cannot be said to prejudice appellees in light of their position that they do not oppose such participation. (Appellees' brief at 13, 31.) Accordingly, we allow the United States to intervene for the purpose of this appeal.

■ Turning now to the merits, the United States argues first that the instant "case appears to be a dispute over title to land. Litigation over title to land in which the United States claims an interest can take place only in a federal district court." (Brief at 9.) It urges that this case is really an action to quiet title to alleys in which the United States claims an interest "[so] . . . [s]uch an action cannot be entertained in the Superior Court." (Brief at 12.) A reading of the complaints makes it clear, however, that appellees were not bringing an action to establish title to land,[9] but were seeking relief from action by the Council which they alleged was beyond the Council's authority. Appellees sought, in addition, the return of the moneys they had been required to pay into escrow in order to take advantage of the Council's favorable ruling on their applications for closure of the alleys abutting their lots.

We view this action, therefore, not as a suit to quiet title, which according to the government's argument belongs in a federal district court, but as an action challenging the Council's action under the Street Readjustment Act. We note that the United States District Court of the District of Columbia reached the same conclusion in a case similar to the instant litigation. Thus, in *Oliver T. Carr, Jr. v. District of Columbia*, (No. 77,445, January 12, 1979), the court rejected the argument that "a 1973 challenge to the authority of the District of Columbia to charge fair market value for the alley space closed" was "in reality a quiet title action pursuant to 28 U.S.C. § 1346(f)." [10]

■ The United States next argues that the trial court's conclusion that "title to the contested alleys was never in the United States" was error. Specifically, the government contends "the appellees' predecessors' original town lot grants . . . are grants from the United States. The original grant documents do not on their face purport to convey any interest in the alleys. . . . Lot numbers alone were used. . . . The abutting owners are here then seeking to go behind their original

---

7. The Ninth Circuit Court of Appeals, in allowing post–judgment intervention in the appeal, recognized the importance of resolving a dispute created by conflicting judicial decisions. *U.S. v. Imperial Irrigation District, supra* at 520. This factor is present in the instant litigation: the United States Court of Claims has concluded, in contradistinction to the trial court's decision on appeal, that the original alleys were owned by the United States. *Calvin–Humphrey v. United States*, 202 Ct.Cl. 519, 480 F.2d 1323 (1976).

8. In *Commercial Security Bank v. Walker Bank and Trust Co.*, 456 F.2d 1352 (10th Cir. 1972), the Tenth Circuit Court of Appeals allowed the United States to intervene, post–judgment, for the purposes of appeal. It noted particularly that the trial court's order purported to bind the United States, which had not been served, joined, or otherwise submitted itself to the jurisdiction of the court. In the instant case, the trial judge in its opinion concluded that "the United States . . . is not entitled . . . through the District of Columbia to charge a fee based upon depreciated value of the lands consisting of the alleys [ordered by the Council to be closed]."

9. Appellees, of course, make no claim that the chain of title to their parcels of realty was faulty and hence judicial action was necessary to correct or cancel any deeds of record.

10. This decision is presently on appeal.

actual grant documents. They may not do this unless there is an irreconcilable ambiguity in the face of the document strongly suggesting a larger grant. There is no such larger grant language in this case . . ." (Brief at 18–20.)

Appellees' response, which persuaded the trial court, is that "[t]he documents which begin the chains of title herein are the deeds of trust by which the original proprietors conveyed their title to *trustees,* not the United States. . . . The fact that the deeds convey land by lot number is in no way inconsistent with [appellees'] theory of this case since, at common law, such a conveyance was entirely sufficient to convey both the lot and a portion of the adjacent alley." (Appellees' Supplemental Brief at 2–5.)

In order to place the parties' arguments as to these documents of title (to the original alleys) in perspective, we must turn to the trial court's opinion recounting the history of the creation of the Federal City in which the alleys in question are located. The court states:

> On January 24, and March 30, 1791, the President by proclamation located and defined the limits of the District of Columbia and appointed the Commissioners who, with their successors, located and laid out the City of Washington. (D.C. Code, p. XXIV and XXXV (1973)). The general boundaries of the proposed City, now called the "original" City, were the Eastern Branch, the Potomac River, Rock Creek to a point near P Street, N.W. then following what is now Florida Avenue to 15th and H Streets, N.E., then south to C Street, N.E. then east to 20th Street and then south to the Eastern Branch. The land within was devoted mostly to farm purposes owned principally by 19 owners hereinafter sometimes referred to as "original proprietors".

> While various maps and plans for the City were being prepared under the direction of the President and the Commissioners, negotiations were entered into between the Commissioners and the original proprietors which resulted in agreements executed by the parties providing for the disposition of land within the original City pursuant to deeds of trust to be executed.

> The Deeds of Trust (see form, Burch's Digest 330–34 (1823)) were executed around June 30, 1791 by the original proprietors and provided for the disposition of the land within the limits of the City of Washington in three different categories: (1) the fee title to streets was vested in the United States. See *Van Ness v. City of Washington, supra* ; (2) the land appropriations or reservations for the use of the United States were purchased by the Commissioners with fee title vesting in the United States at the rate of 25 pounds per acre; (3) the entire residue of the land, after being laid out in squares, parcels and lots was to be divided equally with one–half the land conveyed to the original proprietors by the trustees and the other one–half assigned to the Commissioners to be sold upon such terms and conditions as the President should deem proper with the proceeds from said sales to be first applied towards the payments due the original proprietors, with the remaining proceeds to the President of the United States to be applied for purposes under the Act of Congress (e. g., construction of new governmental buildings) authorizing the acquisition or acceptance.

All agree that we are here concerned with the land contained in the third category described above, *viz.,* the residue of land remaining after the streets of the Federal city had been laid out and certain parcels reserved for the sole use of the United States.[11] The trial court concluded that the Deeds of Trust executed by the original proprietors with the trustees "establish that the original proprietors conveyed to the trustees with the understanding that one–half of the *quantity* conveyed would be

---

11. The land in the original city reserved for the United States, as the trial judge noted, included such property as the Judiciary Square, the President's Square, the Capital Square, the Center Market and the National Church Square.

returned to the original proprietors but not necessarily the same property. The remaining portion was . . . to be sold by the Commissioners to members of the public who wished to purchase land in the City of Washington." (Emphasis in original.) The court concluded further that title to the land abutting the original alleys here in question was conveyed either to the original proprietors or members of the public—all predecessors in title of appellees. Therefore, when the parcels were conveyed by lot number only such conveyances nevertheless included the appropriate portion of abutting alleys.

Certain documents in the National Archives of the United States, viewed by the trial court and conceded by the parties to be authentic, support the conclusion that title to the abutting alleys was held by the predecessors in title of appellees rather than by the United States. Thus, the so-called Register of Squares, a document prepared at the time of the creation of the original city, sets forth the division of the lots between the original proprietors and the public. Each of the pages of the Register gives a detailed breakdown not only of the square footage of the lots, but the square footage of the portions of the alleys adjoining the lots. Such a breakdown showing a portion of the alley in relation to these lots is inconsistent with the theory that the alleys were owned by the United States.

These documents before the trial court also contain a record of the sale of public lands and have columns headed "Square," "Lot," "Square Feet in Lots," "Proportion of Alley," "When Sold or Selected," and "To Whom Sold." Such documents are consistent with and contain the same entries as those found in the Register of Squares. The fact that the records refer to the *sale* of lots *and* to the proportion of the alley certainly suggests that the alleys were included in the sale.

Specifically, although some documents do not give a breakdown of the area of the alleys, it is clear that the figure listed under the column headed "Contents in Square Feet" included the *total* area of the lot *and* alley. For instance, in a lot sold to Morris and Nicholson the documentary information can be diagramed as follows.

| Sq. Ft. of Lot | Sq. Ft. of Alley | Total Ft. Sold |
| --- | --- | --- |
| 2,685 | 159½ | 2,844 |

The 2,844 square foot figure is exactly one-half square foot less than the *total* square footage for the alley and lot combined. This record thus suggests that the sale of the lots included not only the lot, but a proportion of the alley.

Other documentary evidence cited by the trial court in its opinion reveals that "each square was divided equally between original proprietors and the purchasing public. It would seem that if the United States had a fee in the alley the square footage of the alley would have been deducted from the square footage of the total square but such was not the case." (Record at 663.)

We note, as did the trial court, that in 1796 the Commissioners, designated pursuant to the Deeds of Trust to sell one-half the residue to the public, expressed the opinion that alleys had *not* "been directed by the President, or conveyed by the original proprietors for public use," but rather had been "paid for by the purchasers of the Squares" and could be "shut up" if "the whole Square belongs to one person, or to several persons, who will all concur in the measure . . . ." (Record at 666.)

We respectfully disagree with the Court of Claims which concluded that title to the original alleys is in the United States. *Washington Medical Center, Inc. v. United States,* 545 F.2d 116 (Ct.Cl.1976). That court, in reaching its conclusion, acknowledged that the Deed of Trust executed by the original proprietors with the trustees, Thomas Beall and John M. Gantt, provided that "[they] . . . shall convey to the commissioners . . . for the use of the United States for ever, all the said streets, and *such of the said squares, parcels and lots, as the president shall deem proper, for the use of the United States;* and that . . . the residue of the said lots into which the lands shall be divided . . . be conveyed by the said (trustees) to the said

(grantor), his heirs and assigns; and that the said lots shall . . . be sold . . and the said (trustees) will . . . convey all the lots so sold . . . to the respective purchasers in fee simple." *Id.* at 122 (emphasis added).

The Court of Claims then proceeded to focus on the language in the Deed of Trust reading "the trustees . . . shall convey to Commissioners . . . for the use of the United States for ever . . . such of the said squares, parcels and lots, as the president shall deem proper for the use of the United States." It reasoned that when the President had *subsequently* issued "Terms and Conditions for regulating the materials and manner of Buildings and Improvements on the Lots in the City," in which the President referred to alleys, he had thereby exercised his rights under the Deed of Trust and reserved *all* alleys in the original city for the use of the United States. The Court of Claims relied upon one paragraph in the eight paragraphs of Terms and Conditions which deal with the material to be used in building, set–back and size of buildings and the like.[12] This paragraph reads in pertinent part:

The way into the squares, being designed in a special manner for the common use and convenience of the occupiers of the respective squares, *the property in the same is reserved to the public,* so that there may be an immediate interference on any abuse of the use thereof by any individual to the nuisance or obstruction of others. The proprietors of the lots adjoining the entrance into the squares, on arching over the entrance and fixing gates in the manner the Commissioners shall approve shall be entitled to divide the space over the arching and build it up with the range of that line of the square. [*Washington Medical Center, Inc. v. United States, supra* at 124–25 (emphasis in original.)]

The Court of Claims reasoned that the phrase "reserved to the public" contained in this paragraph regulating "the materials and manner of Buildings" was intended to vest title to *all* original alleys in the United States.

We agree with the trial court's observations concerning this conclusion by the Court of Claims.[13] First, the court observed "it seems unlikely that such an important reservation of a fee [to all alleys in the original city] would be buried within what is obviously a simple building code." (Record at 675.) The trial court pointed out that this regulation

does not refer to a fee interest or title in the United States, yet it is based upon documents (Deeds of Trust) which are carefully drawn and worded and which spell out in detail the rights of the signatories. Several times throughout the Deeds of Trust there is reference to the granting or the conveyance of fee simple interests. Since the Regulations track the language of the Deeds of Trust, it would seem that such an important paragraph in the Regulations would have carefully spelled out the rights of the property owners by adopting the language of the Deeds of Trust. The defendants argue that it is significant that the Regulations refer to "property" which they seek to interpret as synonymous with title or ownership, however, after reviewing the Deeds and the Regulations this Court concludes that the failure of the Regulations to refer directly to fee or ownership or title was deliberate; simply said, there was no intent to reserve ownership in the alleys. [Record at 675–76.]

The trial court also pointed out in concluding the President had not reserved for the United States all original alleys that

---

**12.** Thus, the regulation provides, among others, for outer and party walls of all houses to be built of brick or stone, the heights of buildings not to exceed 40 feet and, on the "Avenues," not to be less than 35 feet, and no projections over the streets, "other than the eaves of the house without the consent of the Commissioners."

**13.** The Court of Claims was without the benefit of the material from the Archives relied upon by the trial court in the instant case. Such documentary material had not been authenticated at the time of the proceeding in the Court of Claims.

the Regulations were promulgated pursuant to that section of the Deed of Trust authorizing the President to establish "terms and conditions for regulating the materials and manner of buildings and improvements on the lots in the City of Washington". The President, in his Regulations, uses the same language and states within the Regulations that they are to establish the manner of buildings and improvements in the new city. He then goes on to do just that in his Regulations. That is the specific language of the Deeds of Trust and that specific language is carried over to the building regulations. [Record at 677.]

The government, citing *DeGuyer v. Banning,* 167 U.S. 723, 17 S.Ct. 937, 42 L.Ed. 340 (1897), and *Whitney v. United States,* 167 U.S. 529, 17 S.Ct. 857, 42 L.Ed. 263 (1897), argues that even if the United States did *not originally* own the alleys in question it "divided the lands in the federal city with original owners" and "[e]ach division paper or grant is to be treated as a grant from the United States." (Reply Brief at 8.) The government then argues that since the grants contain only lot numbers, we are barred from going behind the face of the grants to ascertain whether they were intended to convey portions of alleys because of the special deference accorded *federal* grants of land.

In the cases cited, owners claiming lands by virtue of any right or title derived from the Spanish or Mexican government were obliged to present their claims to a board of commissioners to decide on the confirmation or rejection of such claims. A confirmatory patent on the land they issued was deemed to be a grant from the United States, and required to be accepted on its face. We find the government's argument, by analogy to these cases, unpersuasive; the Deeds of Trust in the instant case expressly provided that the original proprietors were conveying the land which made up the original city to individual trustees under specific conditions. The trustees by the express terms of these conditions were required to convey all the land either (1) to the commissioners for the use of the United States or for sale to individual members of the public, or (2) back to the original proprietors. Consequently, in our view, the grants by the trustees pursuant to the Deeds of Trust cannot be deemed grants from the United States as was the situation in *DeGuyer* and *Whitney.*

Finally, the government argues that "[a]ssuming that the United States has only a possessory interest in the alleys, the assessment of a closure charge based upon the full fee value is clearly permissible." (Brief at 16.) [14] The Court of Claims, however, flatly concluded in *Washington Medical Center, Inc., supra* at 121:

[I]f the United States did not have title in fee simple to the . . . alleys at the time they were closed, Congress would not have the power to authorize the counsel to charge for their closing, as the Government cannot sell "property it does not own."

Also, the Street Readjustment Act provides in Section 1 that any alley closed because it is useless or unnecessary shall revert to the abutting property owners *unless* the "title to such land be in the United States." Thus *only* if the United States has "title" to an alley may there be a charge for the land embraced within the alley once it is ordered closed.

We are satisfied that the trial court's conclusions are correct: (1) the Council was without authority to charge appellees for the closing of the alleys in the instant case, and (2) the interests of the United States were adequately represented by the District

---

**14.** This "possessory interest" was variously asserted by the United States to result from occupation of the original alleys under claim of right (Brief at 13) or a cloud on the title because of a serious claim of title. (Reply brief at 2.)

The government's argument that 40 U.S.C. § 66 places a cloud on the title of appellees' predecessors is without merit. That statute directs the Secretary of Interior "to prevent the improper appropriation or occupation of any of the public streets, avenues, squares or reservations belonging to the United States . . . ." Such statute is by its terms inapplicable to the alleys in question here.

during the trial and hence it was not entitled to intervene at trial.

*Affirmed.*