STATE v. JOE C. BROOKS, SR., AND WIFE, ANNE BROOKS; THELMA B. McEACHERN, SINGLE; JIM BROOKS, AND WIFE, ALENE W. BROOKS; FRANCES B. FURLONG, SINGLE; MARY BROOKS, SINGLE; LULA BROOKS, SINGLE

No. 9

(Filed 12 March 1969)

1. Appeal and Error § 4— theory of case

The theory on which a case was tried in the Superior Court must be the theory of the case on appeal.

2. Adverse Possession § 2— hostile possession

The requirement that possession must be hostile in order to ripen title by adverse possession does not import ill will or animosity but only that the one in possession of the lands claims the exclusive right thereto.

3. Adverse Possession § 23— burden of proof

The party claiming title by adverse possession must carry the burden on that issue.

4. Adverse Possession § 25; Waters and Watercourses § 7— title to marshlands — sufficiency of evidence

In this civil action by the State for trespass on realty, for removal of cloud on title and for removal of objects placed by defendants in navigable waters of marshlands allegedly owned by the State, defendants' evidence is insufficient to show thirty years adverse possession of marshlands where defendants stipulated that they do not claim title to the bottoms of the navigable waters located on the property and defendants' evidence either related to acts of possession in navigable waters or was unclear as to whether it related to property not in navigable waters, defendants having failed to show hostile possession of the property in question.

5. Adverse Possession § 25— correlating lines on ground to map

Testimony that the lines on the ground are as shown by a map introduced into evidence is insufficient to show adverse possession for thirty

years where there is no evidence as to how long the lines had been on the ground as shown by the map or that any kind of marker was placed at the boundaries of the lands claimed and had been there for thirty years.

**6. Adverse Possession § 24— fitting description on paper-writing to land's surface**

Those having the burden of proof of adverse possession must locate the land they claim title to by fitting the description contained in a paper-writing offered as evidence of title to the land's surface.

**7. Adverse Possession § 25— use of unenclosed land for grazing — exclusive possession**

One cannot gain title by adverse possession to unenclosed land by using it for grazing where others made similar use of the land during the statutory period, even without his consent, since his possession is not exclusive.

**8. Adverse Possession § 25— grazing cattle**

Defendants have failed to show thirty years adverse possession of marshlands by grazing cattle on the property where their evidence shows that others made similar use of the unenclosed marshlands until a fence was erected by defendants in 1917, and there is no evidence that defendants used the marshlands for grazing cattle after the inland waterway was cut through the area in 1932, the period of 1917 to 1932 not being thirty years.

**9. Adverse Possession § 24— sale of adjacent land**

Evidence that those claiming property by thirty years adverse possession had sold property adjacent to the property claimed is not evidence of adverse possession of the *locus in quo.*

**10. Adverse Possession § 24— evidence of listing and payment of taxes on the land**

It is competent for a person claiming title by adverse possession to introduce evidence that he listed and paid taxes on the land for the purpose of showing his possession was adverse and in the character of owner.

**11. Adverse Possession § 1— definition**

Adverse possession consists in actual possession, with an intent to hold solely for the possessor to the exclusion of others, and is denoted by the exercise of acts of dominion over the land, in making the ordinary use and taking the ordinary profits of which it is susceptible in its present state, such acts to be so repeated as to show that they are done in the character of owner, in opposition to right or claim of any other person, and not merely as an occasional trespasser; it must be decided and notorious as the nature of the land will permit, affording unequivocal indication to all persons that the possessor is exercising thereon the dominion of owner.

**12. Adverse Possession § 1— occupation of the land**

An adverse possessor of land without color of title cannot acquire

title to any greater amount of land than that which he has actually occupied for the statutory period.

**13. Adverse Possession § 25—— sufficiency of evidence**

In this civil action by the State for trespass on realty, for removal of cloud on title and for removal of objects placed by defendants in navigable waters of marshlands allegedly owned by the State, defendants' evidence is insufficient to go to the jury on their counterclaim that they are the owners of the *locus in quo* by reason of thirty years adverse possession.

**14. Appeal and Error § 24—— necessity for objections, exceptions and assignments of error**

The Supreme Court ordinarily will not consider questions not properly presented by objections duly made, exceptions duly entered, and assignments of error properly set out.

**15. Waters and Watercourses § 6; Trial § 31—— removal of objects in navigable waters — directed verdict**

In this civil action by the State for trespass on realty, for removal of cloud on title and for removal of objects placed by defendants in navigable waters of marshlands allegedly owned by the State, the State is not entitled to a directed verdict on the issue of obstructing navigable streams.

ON writ of *certiorari* to the North Carolina Court of Appeals. Same case below reported in 2 N.C. App. 115, 162 S.E. 2d 579. Docketed and argued as Case No. 688, Fall Term 1968, and docketed as Case No. 9, Spring Term 1969.

Civil action for trespass on realty, for removal of cloud on title, and for removal of objects placed by defendants in navigable waters of marshlands allegedly owned by the plaintiff. By amendment to the complaint plaintiff was allowed to pray for issuance of a mandatory injunction requiring defendant Joe C. Brooks, Sr., to remove the objects placed in the navigable streams of marshlands. Defendant answered denying plaintiff's title and alleging title to the marshlands in themselves.

The case came on for hearing before Hall, J., at the October 1967 Civil Session of Brunswick. Both sides introduced evidence.

The following issues were submitted to the jury and answered as appears of record:

"(1) Are the defendants the owners and entitled to possession of the lands described in the Complaint, except that portion thereof covered by navigable waters?

"ANSWER: Yes.

"(2) Is the plaintiff, the State of North Carolina, the owner and entitled to immediate possession of the lands as described in the Complaint?

"ANSWER: ................

"(3) If so, have the defendants trespassed on said land, as alleged in the Complaint?

"ANSWER: ..... ...........

"(4) Have the defendants obstructed navigable waters of the State of North Carolina as alleged in the Complaint?

"ANSWER: No."

From a judgment in accordance with the verdict, plaintiff appealed to the Court of Appeals. On appeal the Court of Appeals, sitting in a panel of three, affirmed the judgment below. This Court in conference on 9 October 1968 allowed the petition for a writ of *certiorari* to review the decision of the Court of Appeals.

*Attorney General T. Wade Bruton, Assistant Attorney General Millard R. Rich, Jr.; John Richard Newton and George Rountree, Jr., of counsel for the plaintiff appellant.*

*Herring, Walton, Parker & Powell by Ray H. Walton, and E. J. Prevatte for defendant appellees.*

PARKER, C.J.

This Court being of the opinion that the subject matter of the appeal, the acquiring of title to marshlands within the State by alleged adverse possession for thirty years, has significant public interest as set forth below, issued a writ of *certiorari* to the Court of Appeals.

This is said in 46 N.C.L.Rev. 779:

"The vast estuarine areas of North Carolina — 'those coastal complexes where fresh water from the land meets the salt water of the sea with a daily tidal flux' — are exceeded in total area only by those of Alaska and Louisiana. Estuarine areas include bays, sounds, harbors, lagoons, tidal or salt marshes, coasts, and inshore waters in which the salt waters of the ocean meet and are diluted by the fresh waters of the inland rivers. In North Carolina, this encompasses extensive coastal sounds, salt marshes, and broad river mouths exceeding 2,200,000 acres. These areas are one of North Carolina's most valuable resources."

[1]   The theory on which the case was tried in the Superior Court must be the theory of the case on appeal. 1 Strong, N. C. Index 2d, Appeal and Error, § 4. As correctly stated in the decision of the Court of Appeals, the case was tried in the Superior Court on the theory of thirty years adverse possession under known and visible lines and boundaries and not under the theory of adverse possession for twenty-one years under color of title.

Defendants in their joint answer, after denying title in plaintiff, aver in their further answer and defense merely "that they are the owners of the lands described in the complaint," and do not mention adverse possession under color of title of the *locus in quo* nor was it mentioned in the evidence or charge of the court.

Plaintiff assigns as error that the evidence of defendants does not suffice to show adverse possession for thirty years within the purview of G.S. 1-35(1).

The evidence as summarized in the decision of the Court of Appeals does not mention two stipulations entered into by and between the parties at the trial. These two stipulations are: ". . . (T)his map [Plaintiff's Exhibit 1] which I will offer in evidence is the map duly recorded in this County of the property claimed by the Defendants and the Plaintiff"; (2) ". . . (T)he defendants will stipulate they do not contend that they own the bottoms of navigable waters located on the subject property. . . ." "The Court: It is stipulated that Still Creek, Simmons Creek, the Eastern Channel, and the Cut Off Creek as shown in Plaintiff's Exhibit No. One are navigable waters."

[4]   The Court of Appeals in its decision stated as evidence of adverse possession a summary of the testimony of Joe C. Brooks, Sr., as follows: "That a portion of the property was leased to International Paper Company for the purpose of building a dock extending into the waterway for the unloading of pulpwood from about 1937 to 1956; . . . that he had fished the creeks and had seen others fishing in them until the dredge came in to clean out the waterway and dumped mud in the upper part and had seen people oystering in there in boats; . . . that he put chicken crates and myrtle bushes in the creeks 'up on the sides of the creek' and next to the grass in 1966, and erected signs indicating oyster gardens and shellfish areas; that the signs were put at the four corners of the property." If Joe C. Brooks, Sr., as he testified, "put chicken crates and myrtle bushes in the creeks 'up on the sides of the creek' and next to the grass in 1966, and erected signs indicating oyster gardens and shellfish areas; that the signs were put at the four

corners of the property," and even if these objects were not placed in navigable waters, this evidence still does not show adverse possession of the property for anything like thirty years.

The Court of Appeals in its decision stated as evidence of adverse possession its following summary of the testimony of James F. Brooks: "(T)hat his father and uncle conducted a general mercantile and naval store business on the property; that their dock extended out from the mainland into Still Creek; that they bought and sold clams and had schooners coming in and loading and unloading at Tubbs Inlet and the mainland; that the dock reached into Still Creek about halfway of what is now the inland waterway; that the dock was there when he first remembered it when he was about 15 years of age. . . ." This is no evidence of adverse possession by defendants of this property which was in navigable waters in the light of the second stipulation quoted above, for the simple reason that its possession by defendants was not hostile and held under a claim of exclusive right thereto.

The Court of Appeals in its opinion stated this: "Mr. Robert J. Sommerset testified that he is 62 years of age; that George Brooks and J. W. Brooks had a warehouse and dock extending into Still Creek used for cargo boats bringing in fertilizer and taking out rosin and turpentine . . .; that the Brooks family had a fish stand on the eastern channel on the beach side adjoining the marsh and on the other side a fishing stand, and one just below the mouth of Simmons Creek; that these fishing points were operated from the time he was about 12 years old until the inland waterway was cut and the places filled in to the point they were no longer used; that his father operated one of the points and he helped him; that when the fish were divided, one share was laid out for Mr. Brooks. . . ."

[2-4]   The requirement that possession must be hostile in order to ripen title by adverse possession does not import ill will or animosity but only that the one in possession of the lands claims the exclusive right thereto. *Dulin v. Faires*, 266 N.C. 257, 145 S.E. 2d 873; *Brewer v. Brewer*, 238 N.C. 607, 78 S.E. 2d 719, 40 A.L.R. 2d 763; 1 Strong, N. C. Index 2d, Adverse Possession, § 2. It seems clear from the testimony that we have quoted above from the decision of the Court of Appeals that the testimony of Joe C. Brooks, Sr., James F. Brooks, and Robert J. Sommerset relates to acts of possession by defendants in navigable waters in the swampland claimed by them; or if any part of the premises in the possession of defendants was not in navigable waters, it is impossible to determine from the record before us what part of it was in non-nav-

igable waters. It is well settled law that the party asserting title by adverse possession must carry the burden of proof on that issue. *Thomas v. Hipp*, 223 N.C. 515, 27 S.E. 2d 528; *Barrett v. Williams*, 217 N.C. 175, 7 S.E. 2d 383; *Power Co. v. Taylor*, 194 N.C. 231, 139 S.E. 381. Defendants stipulated that they do not contend that they own the bottoms of the navigable waters located on the subject property and they then further stipulate that Still Creek, Simmons Creek, the Eastern Channel, and the Cut Off Creek as shown in plaintiff's Exhibit No. 1 are navigable waters. Certainly, in the light of those stipulations, any acts of possession as narrated above by the defendants lack the essential element that their possession was hostile, which is an essential element to ripen title by adverse possession.

[5]   The decision of the Court of Appeals summarizes the testimony of Joe C. Brooks, Sr., a part of which is as follows: ". . . (T)hat he knows the lines are on the ground as shown by the map agreed to; that the property is bounded on the east by D. S. Frink or the D. S. Frink estate, on the south by Ocean Isle Beach, on the west by M. C. or Manley Gore." From an examination of the testimony in the record, it appears that the map referred to was plaintiff's Exhibit No. 1. The record shows that this map was made 14 April 1964. There is no evidence in the record as to how long the lines had been on the ground as shown by this map. There is no evidence in the record that iron stakes or any kind of stake or monument or marker was placed at the boundaries of lands claimed by defendants and had been there for thirty years.

[6]   The Court of Appeals seemed to think that the Frink line on the east and the Gore line on the west of the property as stated by defendants Joe C. Brooks, Sr., and James Brooks had been established by the evidence. There is no evidence where those lines were on the ground during the claimed thirty years of adverse possession. If the defendants had desired to claim adverse possession under color of title, which they do not here, the proper way to prove those lines would have been to put in evidence the Gore and Frink deeds, and those of their predecessors in title, and establish those lines on the ground for the thirty-year period. This was not done. It is well established that those having the burden of proof, as defendants do on the first issue here, must locate the land they claim title to by fitting the description contained in the paper-writing offered as evidence of title to the land's surface. G.S. 8-39; *Andrews v. Bruton*, 242 N.C. 93, 86 S.E. 2d 786; *Locklear v. Oxendine*, 233 N.C. 710,

65 S.E. 2d 673. Surely, the map, plaintiff's Exhibit No. 1, under the circumstances here lends no strength to defendants' case.

V. W. Herlevich, a witness for defendants, was found by the trial court to be an expert in the field of land surveying. One of the counsel for defendants read to Mr. Herlevich a description in a deed from J. F. Sommerset and wife to George E. Brooks dated 5 September 1907 and properly recorded, and asked him if he knew whether or not the property shown on plaintiff's Exhibit No. 1 is included within that description just read to him. Mr. Herlevich answered: "Yes. It encompasses some of the area. I wouldn't say all of it, but it covers a portion of the area." This is an illustration of the uncertainty and confusion in defendants' evidence.

[7, 8]    Defendants offered evidence tending to show, as stated in the decision of the Court of Appeals, that George E. Brooks and J. W. Brooks used the *locus in quo* for a cattle and hog range ever since they could remember until the cutting of the inland waterway in 1932. The evidence shows that Robert J. Sommerset's grandfather had a drove of cattle grazing on the *locus in quo* and one or two other persons had a cow or two there. This is a part of the testimony of Robert J. Sommerset:

"Q.  Mr. Sommerset, state what use, if any you know, the marsh land was put to South of this dock by the late George Brooks and/or J. W. Brooks?

"A.  Well, they used it for pasture and fishing purposes.

"Q.  Now, what type of pasture? What was pastured on the property?

"A.  Well, principally, cows, and some ponies.

"Q.  Do you remember when, with reference to your age, how far back can you remember that, Mr. Sommerset?

"A.  Well, I would say 50 years.

"Q.  Do you remember — Was there any fencing?

"A.  Sir?

"Q.  Did they have fencing within the boundaries of Plaintiff Exhibit One? Did Mr. Brooks have any fencing on the property?

"A.  Well, at one time on the marsh land, no, and at one time, yes.

"Q.  Well, now when? Was your father — Was your grand-

father at one time — State whether or not your grandfather at one time was interested in this property with them?

"A.   Yes, sir.

"Q.   State whether or not your grandfather had used cattle on this property?

"A.   Yes, sir.

"Q.   State whether or not he continued to use and range cattle on there after the fencing was built and state what, if you will?

"A.   Well, at one time it was open range. Any body had cattle on it. The fields was fenced and the range was open. Later when the stock law become effective, Mr. Brooks fenced an area of marsh and hill land, and at that time my grandfather took his cattle out and if anybody else. . . .

"Q.   Why did your grandfather take his out, if you know?

"A.   Well, he didn't want to absorb the cost of the fencing.

"Q.   How close did the fencing come down to the marsh?

"A.   Well, it come down to the marsh and generally the way it was handled was to take a soft place, soft enough the cows wouldn't attempt to go around the fence — in other words, they would bog to the point that they wouldn't go around."

According to defendants' testimony, Robert J. Sommerset's grandfather and others made similar use of the unenclosed marshlands for grazing as defendants or their lineal ancestors did. It seems to be settled law that one cannot gain title by adverse possession to unenclosed land by using it for grazing where others made similar use of the land during the statutory period, even without his consent, since his possession is not exclusive. *Whitney v. United States,* 167 U.S. 529, 42 L. Ed. 263; *Bergere v. United States,* 168 U.S. 66, 42 L. Ed. 383; Annot. 170 A.L.R. 845-46.

The evidence in the record shows that the fence was erected in 1917 and stayed there until the inland waterway was cut in 1932. There is no evidence of defendants' using the marshlands for grazing cattle after the inland waterway was cut. From 1917 to 1932 is not thirty years.

[4]   The Court of Appeals stated this evidence introduced by defendants as tending to show adverse possession: ". . . (T)hat a portion of the property was leased to International Paper Company for the purpose of building a dock extending into the waterway for

the unloading of pulpwood from about 1937 to 1956; that from his father's death in 1942 he and his brothers and sisters got oysters and clams out of the area; . . . that his father gave the Conservation and Development Department, using PWA labor, permission to plant oysters one year, but refused permission the next year and after his refusal they did not attempt to plant oysters." It is apparent that these acts by defendants were in respect to navigable waters and by reason of the second stipulation these acts were not acts tending to show adverse possession.

[9]    Defendants introduced evidence that they had sold lands immediately south of the black line as shown on the map, plaintiff's Exhibit No. 1. The sale of this land does not show adverse possession of the *locus in quo*.

Plaintiff on 10 February 1967, pursuant to notice given, took the deposition of Joe C. Brooks, Sr., one of the principal defendants. During the trial plaintiff introduced in evidence this adverse examination. A part of the testimony of Joe C. Brooks, Sr., given on this adverse examination is set forth below showing the vagueness and the uncertainty of defendants' contention that they had acquired title to the *locus in quo* by adverse possession for thirty years:

"Q.  All right, sir. Mr. Brooks, are you claiming ownership to these creeks, Still Creek and Horse Foard Creek and Simmons Creek?

"A.  Yes sir, I am claiming ownership to that piece of property.

"Q.  Everything within the boundaries as marked on State's Exhibit 1-A?

"A.  Yes sir.

"Q.  Well, on what do you base your claim of ownership?

"A.  I base my claim of ownership on the deed.

"Q.  What deed is that?

"A.  We have always —

"Q.  Well, what deed?

"A.  We have always thought we owned it, all our lives.

"Q.  Well, what deed?

"A.  We had cattle on it.

"Q.  Well, what deed is that?

"A.  Ever since I can remember.

"Q.  What deed is that?

"A.  I partly had it fenced off at one time.

"Q.  What deed is that?

"A.  What deed?

"Q.  Yes sir.

"A.  The deed that we have now.

"Q.  Well, where is that deed recorded? Where did you get the deed, from whom?

"A.  What the deed?

"Q.  Yes sir.

"A.  I got the deed from the rest of the heirs.

"Q.  The rest of what heirs, Mr. Brooks?

"A.  My brothers and sisters.

"Q.  Well, from whom did they claim as heirs?

"A.  They all claim they own it.

"Q.  Well, on what did you base your claim, that is what I want to know?

"A.  What basis?

"Q.  Yes sir, what is the basis of your claim?

"A.  The basis according to the deeds and what I was told.

"Q.  Well, what deeds are they?

"A.  The deed that I got.

"Q.  Well, from whom?

"A.  I got it from the heirs.

"Q.  The brothers and the sisters?

"A.  The brothers and sisters.

"Q.  Who are these brothers and sisters?

"A.  Jim —

"Q.  Jim Brooks?

"A.  Yes. George Brooks, Lula Brooks, Zelda Brooks, Mary Brooks, Mamie Orrell, Sig Goodman and Thelma McEachern.

"Q.  Who is Sig Goodman?

"A.  He is a lawyer up here in Wilmington, don't you know him?

"Q. No sir. Well from whom do these brothers and sisters claim, under whom do they claim as heirs, these heirs that signed the deed? On what do they base their claim?

"A. Well, I guess they based it on because we own it.

"Q. Well, what I want to know is what is your proof of ownership?

"A. Well, I'd say we owned it, because we have always had it, ever since I can remember, we have always used it and the same piece of land that Mr. Gore got around there come out of it.

"Q. Out of what?

"A. Out of the same piece that we sold him.

"Q. Well, where did that come from?

"A. It come from us.

"Q. Well, where did you all get it?

"A. It come from the Roy G. Brooks Estate.

"Q. Well, where did you get it originally?

"A. Originally?

"Q. Yes sir.

"A. Well, I couldn't tell you that, cause I don't know. It came from the George E. Brooks Estate.

"Q. It came from the George E. Brooks Estate?

"A. Yes sir and my mother.

"Q. Who was your mother?

"A. She was Stella E. Leonard."

[10] It is significant that defendants offered no evidence as to the listing and paying of taxes on the *locus in quo* claimed by them, which evidence, if they had listed and paid their taxes, would be competent in evidence to show that their possession was adverse and in the character of owner. *Corbett v. Corbett*, 249 N.C. 585, 107 S.E. 2d 165.

[11] In *Mallet v. Huske*, 262 N.C. 177, 136 S.E. 2d 553, Rodman, J., made this quotation from *Locklear v. Savage*, 159 N.C. 236, 74 S.E. 347, a very clear definition of adverse possession written by the eminent Justice Platt D. Walker, and quoted many times in our reports:

"It consists in actual possession, with an intent to hold solely for the possessor to the exclusion of others, and is denoted by the exercise of acts of dominion over the land, in making the ordinary use and taking the ordinary profits of which it is susceptible in its present state, such acts to be so repeated as to show that they are done in the character of owner, in opposition to right or claim of any other person, and not merely as an occasional trespasser. It must be decided and notorious as the nature of the land will permit, affording unequivocal indication to all persons that he is exercising thereon the dominion of owner."

**[12]**     This is said by Ervin, J., for the Court in *Carswell v. Morganton,* 236 N.C. 375, 72 S.E. 2d 748:

"An adverse possessor of land without color of title cannot acquire title to any greater amount of land than that which he has actually occupied for the statutory period. *Land Co. v. Potter,* 189 N.C. 56, 127 S.E. 343; *Rhodes v. Ange,* 173 N.C. 25, 91 S.E. 356; *Anderson v. Meadows,* 162 N.C. 400, 78 S.E. 279; *May v. Manufacturing Co.,* 164 N.C. 262, 80 S.E. 380; *Berryman v. Kelly,* 35 N.C. 269, 2 C.J.S., Adverse Possession, section 181. He cannot enlarge his rights beyond the limits of his actual possession by a claim of title to other land abutting that which he actually occupies, even though such other land may be defined by marked boundaries. *Logan v. Fitzgerald,* 87 N.C. 308; *Bynum v. Thompson,* 25 N.C. 578."

The reason for the rule restricting one who holds adversely without color of title to the amount of land actually occupied by him was well stated by the eminent Chief Justice Ruffin in *Bynum v. Thompson,* 25 N.C. 578, as follows:

"But the question is, what is possession for that purpose? Plainly, it must be actual possession and enjoyment. It is true, indeed, that if one enters into land under a deed or will, the entry is into the whole tract described in the conveyance, *prima facie,* and is so deemed in realty, unless some other person has possession of a part, either actually or by virtue of the title. But when one enters on land, without any conveyance, or other thing, to show what he claims, how can the possession by any presumption or implication be extended beyond his occupation *de facto?* To allow him to say that he claims to certain boundaries beyond his occupation, and by construction to hold his possession to be commensurate with the claim, would be to hold the ouster of the owner without giving him an action there-

for. One cannot thus make in himself a possession, contrary to the fact."

**[13]**     Testing defendants' evidence of adverse possession by the accepted standard, it is apparent that considering the evidence of defendants in the light most favorable to them and giving to them every reasonable inference to be drawn therefrom, they have not adduced sufficient evidence to carry the case to the jury and their counterclaim averring that they were the owners of the *locus in quo* should have been nonsuited.

**[14, 15]**     Plaintiff asserts that one of its two points raised by its appeal is as follows:

> "2.     Where the evidence shows that the Defendants placed from fifteen hundred to two thousand chicken crates and other obstacles at the edges of the admittedly navigable streams running through the marsh, which obstacles were covered by the tide at high water, was not the Plaintiff entitled to a directed verdict on the issue of obstructing navigable streams?"

This contention has no exception and assignment of error to support it. It is well settled that the Supreme Court ordinarily will not consider questions not properly presented by objections duly made, exceptions duly entered, and assignments of error properly set out. 1 Strong, N. C. Index 2d, Appeal and Error, § 24. We agree with the Court of Appeals in saying that this point contended by plaintiff is without merit for the reason set forth in the opinion of the Court of Appeals, even if the question had been properly before the Court for decision.

The fact that defendants did not offer any evidence tending to show adverse possession for thirty years does not mean that the plaintiff, the State of North Carolina, is the owner and is entitled to immediate possession of the lands described in the complaint. That issue is still to be determined by a jury at a succeeding term of court.

The result is this: The judgment for defendants on their counterclaim is reversed. The judgment in the Court of Appeals decreeing that the defendants have not obstructed navigable waters of the State of North Carolina, as alleged in the complaint, is affirmed. This case is remanded back to the Court of Appeals which will remand it to the Superior Court for further proceedings to determine whether or not the plaintiff, the State of North Carolina, is the

owner and entitled to the immediate possession of the lands described in the complaint.

Reversed in part,

Affirmed in part, and

Remanded with directions.